# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00153-SCT

*JIMMY DAVID WILLIAMS a/k/a JIMMY D.*
*WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/18/2023 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| TRIAL COURT ATTORNEYS: | AMANDA LYNN GALLE |
| | SARAH COURTNEY REESE |
| | CAROLYN ANN LEWIS |
| | MICHAEL GLEN DYKES |
| | NICOLE COLLINS HUFFMAN |
| | ROBERT JAMES KNOCHEL |
| | NICHOLAS TYLER MOBLEY |
| | ANGEL MYERS McILRATH |
| | NESHONDRIA DEQUANDRA ELLERBY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ZAKIA B. CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/01/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    Jimmy David Williams appeals the trial court's denial of his motion for new trial.  He

argues his sexual battery conviction is against the overwhelming weight of the evidence due

to conflicting testimony. Because the trial court did not abuse its discretion by denying the motion for new trial, Williams's conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2. On the morning of Wednesday, March 7, 2018, Becky,[1] a ninth grader at Moss Point High School, left her house to walk down the street to the school bus stop. Wednesdays were uniform inspection days for Becky, who was in the Junior Reserve Officers' Training Corps (JROTC) program at her school. Because it was inspection day, Becky left for school early without her brother.

¶3. On her way to the school bus stop, Becky was stopped by Williams. Becky knew Williams because he was a friend of her stepfather. Williams, who was in a white SUV, pointed a gun at Becky and told her to get in the back seat of the vehicle. Becky complied. Williams drove to a nearby driveway, parked, and directed Becky to remove her clothes. Williams then got into the backseat with Becky, pulled down his pants, and inserted his penis into her vagina "more than once." Williams eventually stopped when a school bus drove by. Williams pulled up his pants and instructed Becky to put on her clothes, which she did. Williams got back into the front seat and drove Becky to school. He dropped her off "[w]ith the rest of the car riders in the back of the school." As Becky exited the vehicle, Williams threw six dollars[2] at her and "told [her] not to tell anyone."

¶4. Once at school, Becky immediately advised one of her JROTC instructors, Master

---

[1] A fictitious name is used to protect the minor child's identity. Becky's date of birth is December 17, 2002.

[2] The six dollars consisted of one $5 bill and one $1 bill.

2

Chief Douglas Brown, what had happened. Becky's mother and the Moss Point Police Department were contacted. Becky was taken to Singing River Hospital where a sexual assault examination was performed.

¶5. Williams was indicted and charged with kidnapping and sexual battery. At trial, Becky testified to the above events. Becky identified Williams as the man she saw the morning of March 7.

¶6. Brown testified that on the morning of March 7, 2018, before school had started, Becky entered the back entrance of the classroom and was "absolutely hysterical," "distraught," and "crying." According to Brown, Becky "was trying to breathe and talk" but he "couldn't get her to say anything for . . . a few minutes." After she calmed down, Becky explained to Brown that "a man . . . a friend of . . . her stepfather . . . had approached her, while she was headed to the bus stop, with a firearm and instructed her to get in the car." The man then took her "away from the area and . . . raped her and brought her back and dropped her off at the school." Brown stated that based on Becky's body posture, he could tell "she hurt" and that he had to help her walk down the hallway to the resource office. Brown then advised another JROTC instructor, Lieutenant Commander Tara Lambert, that Becky was in the office and that Lambert needed to hear what Becky had to say.

¶7. According to Lambert, when she saw Becky around 7:40 a.m., Becky's "head was down" and she "was shaking really badly and crying." Lambert testified that Becky "stated that her stepfather's friend put a gun to her head . . . and raped her." Lambert also testified that Becky "threw $6 on the floor" and said, "that's the money he paid me not to say

3

anything." Lambert explained that while waiting on law enforcement to arrive, Becky did not want to sit down because it "hurt so bad."

¶8. Singing River Hospital emergency room nurse Hillary Howell Jackson performed a sexual assault examination on Becky around 8:30 a.m. According to Jackson, Becky presented to the emergency department with complaints of sexual assault. Becky advised Jackson that she knew the individual as "family friend Jimmy Williams," that around 7:15 a.m., as she walked to school, Williams pulled up beside her in his vehicle, pointed a gun at her, and told her to get in the vehicle. Once in the vehicle, Williams told her to remove her pants and underwear and then forced himself on top of her, penetrating her vagina with his penis, and forcing her to have intercourse with him.

¶9. Jackson, who was accepted as an expert in the field of sexual assault examination, opined that based on her examination, "sexual abuse was highly suspected." Jackson explained that Becky had two vaginal tears and a vaginal abrasion, with bleeding observed at the tear and abrasion area. Jackson noted that the physical findings were consistent with the history Becky had reported. Jackson obtained various swabs, including a vulvar, vaginal, and rectal swab. Jackson also collected Becky's clothing, including her underwear.

¶10. Kimberlee Snowden, an investigator with the Moss Point Police Department, spoke with Becky after the sexual assault examination. Snowden described Becky as "disheveled and upset" over what had happened. Snowden testified that Becky told her about the incident and that Becky's version of events was consistent with what Becky had told both Brown and Lambert.

4

¶11.    Snowden also spoke with Williams. Williams confirmed that he was thirty-two years old and that his date of birth is May 24, 1986. Snowden's interview of Williams was recorded, admitted into evidence, and published to the jury.

¶12.    Snowden obtained buccal swabs from both Becky and Williams. She sent the buccal swabs, the vulvar, vaginal, and rectal swabs, and Becky's clothing to the crime lab for forensic testing.

¶13.    Lindsay Nomichith, who works for the Mississippi Forensics Laboratory, was accepted as an expert in the field of serology. She explained that serology "is the examination of items of evidence for the presence or absence of blood or biological fluids." Nomichith testified that the P30 protein, which indicates the presence of seminal fluid, was found on Becky's vulvar, vaginal, and rectal swabs. The P30 protein was also found on Becky's underwear, and "microscopic examinations for sperm cells were positive." In other words, according to Nomichith, sperm cells were present on Becky's underwear.

¶14.    George Schiro, the lab director at Scales Biological Laboratory, a private DNA testing facility, was accepted as an expert in the field of bioscience and forensic DNA analysis. Schiro explained that he focused his attention on Becky's vulvar and vaginal swabs because, in his opinion, "those [were] the two most . . . intimate samples that were collected in this case." Schiro testified that the P30 protein as well as sperm were present on both the vulvar and vaginal swabs.

¶15.    A partial DNA profile was obtained from Becky's vaginal swab. According to Schiro, Williams could not be excluded as the source of that partial DNA profile.

¶16. A mixed DNA profile, one major DNA contributor and one minor DNA contributor, was obtained from the sperm fraction of Becky's vulvar swab. According to Schiro, the major DNA contributor profile matched the DNA profile obtained from Williams, and the minor DNA contributor profile was consistent with the DNA profile obtained from Becky. Schiro opined that is was "highly likely that [Williams] was the contributor to the sperm fraction from the vulvar swab."

¶17. Although Williams elected not to testify, two witnesses were called in his defense. Kathy Scott, Moss Point School District's lead nurse, testified that when she saw Becky that morning, Becky "was neatly dressed," that she "had on her JROTC uniform," and that "[h]er hair was in place, intact, pulled back, and very well put together." When asked to describe Becky's emotional state, Scott stated that Becky "was crying," that "she was very upset," and that "she was stating at different times that it hurt."

¶18. Pascal Fraisse, a licensed master social worker, met with Becky approximately two weeks after the incident on March 20, 2018. According to Fraisse, during this meeting, Becky reported that she had been kidnapped and raped by a "group of men" before school as part of a gang initiation. Fraisse explained he did not take notes during his meeting with Becky but, instead, made notes immediately after the meeting had concluded. He acknowledged it was possible "that [he] could have mistakenly put [the gang initiation and the kidnapping and sexual battery] together."

¶19. Becky denied telling anyone, including Fraisse, that she had been kidnapped by a group of men and gangraped. She admitted that she had discussed the fact that she was born

into a gang and that her uncle was the gang leader. Becky explained that "[Fraisse] might have written it wrong or read it wrong, but what [she] was telling the doctor [w]as how you get initiated in a gang[.]" According to Becky, because she was born into the gang, she did not "have to get raped to be in the gang." Becky testified that she "was not gang-raped" and that she told Fraisse that Williams had kidnapped and sexually battered her.

¶20. Williams was convicted of sexual battery, and he was sentenced to serve thirty years, day for day, in the custody of the Mississippi Department of Corrections, without the possibility of parole.[3] Williams filed a motion for new trial or, alternatively, a motion for judgment notwithstanding the verdict, which the trial court denied. Williams timely appealed.

## DISCUSSION

¶21. Williams argues the trial court "erroneously denied" his motion for new trial. "Our role as appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (citing *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 948 (Miss. 2000)). "In carrying out this task, we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id.* (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

¶22. Williams asserts:

---

[3] The jury was unable to reach a unanimous verdict on the kidnapping charge. As a result, the trial court declared a mistrial on the kidnapping charge.

7

Approximately two weeks after [Becky] implicated [him] for kidnap and assault, she revealed to her therapist that a "group of men" kidnapped and raped her on March 7, 2018, while she was on her way to school. [Becky] also indicated that the assault was likely related to her initiation into the Vice Lords gang of which [Becky]'s uncle was the leader.

Williams claims that because Becky "gave a drastically different account, one that did not include Williams," the verdict was against the overwhelming weight of the evidence. We disagree.

¶23. "Conflicting testimony does not evince overwhelming evidence; [w]here the verdict turns on the credibility of conflicting testimony and the credibility of the witness, it is the jury's duty to resolve the conflict." *Wilson v. State*, 343 So. 3d 1041, 1051 (Miss. 2022) (alteration in original) (internal quotation marks omitted) (quoting *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008)).

> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

*Id.* (quoting *Boone v. State*, 973 So. 2d 237, 243 (Miss. 2008)).

¶24. The jury heard Fraisse testify that two weeks after the incident, Becky advised she had been kidnapped and gangraped by a "group of men." But the jury also heard testimony from *multiple* witnesses that Becky had been kidnapped and sexually battered by Williams. Indeed, Becky's two JROTC instructors, Brown and Lambert, Investigator Snowden, and

nurse Jackson all testified that, according to Becky, Williams had kidnapped her at gunpoint and forced her to have sex with him in his vehicle. Notably, Becky's statement to Brown, Lambert, Snowden, and Jackson occurred immediately or shortly after the incident, not two weeks later.

¶25. Additionally, the jury heard Becky testify that Williams kidnapped her at gunpoint and forcibly put his penis in her vagina. Becky's testimony was supported by the sexual assault examination, which noted a vaginal tear and abrasion as well as bleeding and soreness. Becky's testimony was further supported by DNA evidence, which noted sperm on her underwear and Williams's sperm on her vulva and in her vagina.

¶26. As the record reflects, the jury heard all evidence and testimony, and it was presented with both the State's and Williams's theory of the case. "[W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little*, 233 So. 3d at 292 (internal quotation marks omitted) (quoting *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)). "This is a classic case of conflicting evidence presented to a jury on factual dispute and the jury obviously resolved the credibility issues against [Williams]." *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993). "The jury simply did not accept [Williams]'s account, and that was its decision to make[.]" *Eubanks v. State*, 341 So. 3d 896, 911 (Miss. 2022) (second alteration in original) (internal quotation marks omitted) (quoting *Williams v. State*, 64 So. 3d 1029, 1033 (Miss. Ct. App. 2011)). Williams argued and presented his theory of the case to the jury, and it was rejected.

¶27. Considering the evidence in the light most favorable to the verdict, we do not find the verdict to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 292 (internal quotation mark omitted) (quoting *Lindsey*, 212 So. 3d at 45). As a result, the trial court did not abuse its discretion by denying Williams's motion for new trial. *Id.*

## CONCLUSION

¶28. Williams's conviction and sentence are affirmed.

¶29. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**